Okay, we'll hear next number 20-1552, Takeda Pharmaceutical Company v. Torrent Pharmaceuticals Ltd., Mr. Saberwall. Here, because the two of you are discussing different issues, we'll let you have two replies, but that's not a good practice. But go ahead, Mr. Saberwall. Yes, thank you, Your Honor. Yes, I do recognize that. We are only addressing the obvious-type double-patenting argument. Your Honor, again, thank you. Thank you to the Court for your time. We've served over 40,000 pages for this appeal, but for today, Your Honors, my argument relies upon only one sentence that I'd like to read into the record, and this is from APTX 31. The main point of dispute between the parties concerns the motivation of the proposal of Claim 162 of the FENG patent to replace it with a uracil scaffold based on the disclosures regarding uracil and QUIM. Your Honors, that statement is not from Takeda. That statement is not from Torrent. That is from the Court. The Court focused the issue, the main point of the dispute, as the motivation of the proposal. However, what the Court did not do is ever tell either any of the parties what the POSA is. One would think that if the fact finder is going to identify motivation of a POSA as the main dispute, then it was incumbent upon the fact finder to define the POSA. The Court did anything but that. The Court absolutely refused to do so and made a series of four reversible errors. Number one is set forth above. The Court said it comes out the same way, whatever skill in the art you attribute to the POSA. How is that error? It may not be a desirable way to approach it, but certainly if the Court says, I'm not going to decide the issue because it comes out the same way under either definition, where's the mistake? Your Honor, the mistake is simple. If the Court assumed the defendant's definition, the person of ordinary skill in the art, is correct, then Takeda's expert, by his own admissions during deposition and testimony, admitted that he cannot and does not meet that definition. If you're going to, on the one hand, say, all right, I am going to assume that we will use Torrance's definition, which requires at least some years of experience in DPP-4 inhibitors and diabetes, then what the Court should have done is given far more credibility to the only expert who met that definition, and that was Torrance's expert. Takeda's expert is in a completely different field. He spent 47 years studying hallucinogens, LSD, antipsychotics. He has no experience in this area, Your Honor. We're not talking about fish oil here. We're not talking about a headache treatment. We are talking about a specific type of inhibitor called a DPP-4 inhibitor. Did you do a Daubert motion to exclude Dr. Nichols? We did not, Your Honor, and that's an interesting question. Did you ever object to his testimony? Yes, we did. Yes, we did. We did extensive cross-examination to the objection of counsel during his trial. We didn't file a bench trial, and that would have only succeeded in upsetting the judge. It probably wouldn't have worked because the judge in a bench trial wants to weigh their evidence, and more importantly, and perhaps more disconcertingly, the parties, Your Honor, and this is in footnote one of our brief, the parties expressly agreed that we wouldn't do this, and I was very surprised and disappointed to see that counsel has now come back, despite a written agreement between the court of omission because we didn't file it down. The theory that you have is that Mr. Nichols or Dr. Nichols wasn't a POSA, and therefore, that the district court couldn't rely on his testimony, as I understand it, but if I read the district court's decision, that it would have come out the same way without relying on Dr. Nichols' testimony. Am I incorrect about that? Yes, Your Honor, respectfully, you are, and the reason is because the court exalted Dr. Nichols' opinion over Dr. Rotella on every single major issue, and I have the site pages for that. For example, let's start with the most important issue, the main point of dispute, motivation. The court said motivation is the most important issue here. By the way, I'm going to rely on Dr. Nichols, APPX32. Dr. Nichols said the Kim reference does not mention DPP4 inhibitors, and therefore, there's no motivation to come out, aside from the fact that that is factually incorrect. That is exactly the opposite of what the court was supposed to do. If the court said, I am going to utilize Torrance's definition, what the court should have done is not rely on Dr. Nichols for that, and not rely on Dr. Nichols. I'm sorry, sir, where on A32 did, can you show me where? Sure. The district court's lack of motivation to make the adjustments to F162 in view of Kim. Sure. Relying on Dr. Nichols? Yes. It's in footnote 3, Your Honor. Dr. Nichols stated that diabetes, the Kim reference does not mention DPP4 inhibition, transcript site 61, colon 25 to 62, colon 2. The court relied on Dr. Nichols, Your Honor, even though he said he was going to utilize defendant's definition. This is a clear error that cannot be reconciled. This was an irreconcilable conflict. Well, where does Kim mention DPPIV inhibition? Where does Kim say this thing called uracil inhibits the DPPIV enzyme? It's a DPP4, Your Honor, and it does not mention DPP4 inhibitors, but that was the problem. As Dr. Rotelli... So it doesn't mention it? It does not mention it? That is correct. It does not... Okay. So then what is wrong with that statement? Because footnote 3, that quote, the Kim reference does not mention DPP4 inhibition. Because the court relied upon the fact that the Kim reference does not mention that as a lack of motivation, Your Honor. And that's the point here. And our... Where's the motivation? The motivation that you're arguing for comes only from the fact that these compounds mentioned in Kim seem to have beneficial effects on the treatment of diabetes. Is there anything more to it than that? I mean, there's no mention of uracil in Kim, right? Well, Your Honor, there doesn't need to be because there were... In the record, there's extensive prior art. The Canstrup reference, 2004, the Marx reference, 2004, talking about the use of DPP4 inhibitors in this area, talking about DPP4 inhibitors, the fact that the Kim reference specifically doesn't have all of the elements required does not mean that there was no motivation. A person of ordinary skill in the art is presumed to know the common knowledge. And as Dr. Rotelli extensively defined, there was a huge amount of information that came to the surface between 2000 and 2004, including but not limited to the use of DPP4 inhibitors in this area, the fact that the cyanobenzoyl and aminopyperidinyl... Okay. I'm sorry. I just want to make sure I understand. Sure. The Kim reference doesn't say anywhere that uracil lowers blood glucose by inhibiting the DPP4 enzyme, right? It doesn't say that. It does not say that. Okay. Is there some other reference, even if it's not Kim, but maybe somewhere else, where there's a teaching in the prior art that uracil inhibits this particular enzyme? Yes, Your Honor. And that comes from at least two references that we have. The Canstrup reference, that is APX333246 to 33347JTX5, which discloses xanthine structures in which uracil is part of the two-ring structure that are listed as potent DPP4 inhibitors. Example 16 of Canstrup discloses... I got lost there. What's the name of this reference at 33246-47? I apologize, Your Honor. I've had too much coffee this morning. I'm talking too fast. The Canstrup reference 2004, the APPX numbers are 333246-33347. Can you point us to some expert testimony that says that someone skilled in the art would have taken the uracil structure from these prior art references and that that would give a motivation to use it to replace the scaffolding in the 162? Yes, Your Honor. That came from the testimony of Dr. Rotella. Where is that? Your Honor, I don't have the exact pages of the trial transcript, but there was an extensive discussion of the prior art, and Dr. Rotella specifically talked about the Canstrup references we showed demonstrators for this. Okay, but you're supposed to come to oral argument prepared to show us. You can't just say, oh, it's in there somewhere. Your Honor, I apologize. It's a huge record. I will ask one of my colleagues to find specific pages in the transcript, and hopefully I'll get that to you before the end of this, but I will represent you. Okay. I think we're out of time unless my colleagues have further questions for you now. Okay, so we'll hear from Mr. Poulos, who's presumably going to discuss the obviousness question, right? That's right, Your Honor. Yes, Ivan Poulos on behalf of Appellant Indico Remedies. May it please the court. We're asking the court to reverse the district court's judgment on obviousness on the basis of three independent legal errors. First, as you just heard, the court failed to define the level of skill of art despite that level being in dispute, but second, independently, the court did not conduct its analysis through the lens of a person having ordinary skill in the art, because both sides agreed that such person would, quote, absolutely, and that's a quote from Takeda's expert, Dr. Nichols, have used structure activity relationships to guide the path forward, but there was no actual analysis by the court on that question. Okay, but I think you have a... Let's assume that we get past the lead compound issue, and we assume that you're correct about the lead we're going to not pay any attention to Dr. Nichols' testimony because of that. Now, even when you get past the lead compound analysis, you still have to be able to find that there would have been a motivation to replace the structure of DCAX, which is your lead compound. That's right, your honor. Okay, so what's the motivation to do that? I mean, it seems to me that all you talk about is, well, chemists like to find new compounds, and they're trying to avoid the prior art. I'm not sure that's sufficient. What other motivation is there? Well, your honor, when you have a lead compound that is potent, like this one is, the key is that you actually know why it's potent, and it's because of those two main substituents for which there's a lot of evidence that we've cited to, and that's the cyano and the amino groups. Now, the motivation to then produce additional potent compounds based on that is the fact that the POSO would want to make additional compounds that are free of patent protection, that may, in fact, have more potency. There's a motivation to improve upon the potency and properties of the compound that existed, and really, all that requires is, it's based on the assumption. Why would using uracil as a scaffolding for DCAX result in a more potent compound? What's the evidence that that would be the case? Well, your honor, the evidence and the that the new compound have properties that are, quote, similar to the old. So, there would definitely be an expectation that it would be a potent compound. Now, and that's the motivation. That's because of the substituents, right? Exactly right. Why is there a motivation to replace the Zantac scaffolding with the uracil scaffolding? So, two parts to that answer. The first is that you would want to keep those substituents because that is what's responsible for the potency. Now, replacing the scaffold is not expected to affect the potency. If you can hang those substituents in the same relative locations to do the same job, and that's where the similarity between xanthine and uracil comes in. They're both obviously nitrogen. What's the motivation to change the scaffolding? To make additionally potent compounds. To do what? First of all, the motivation to change the scaffold is to make additional potent compounds, which is how this field develops. You make analogs and further develop potent compounds that you know why they're potent. You say, let's make some more and see if we can improve it. The motivation to do uracil in particular is because xanthine and uracil are very similar, and they have corresponding positions where you can put these two substituents such that they would be in the same place. And if you see in our brief, we actually have a picture of that. So, you're able to take these cyano and amino groups and hang them in the same places on a very similar scaffold. There are other advantages. You're going from two rings to one ring. If I may just cut in there, we have testimony from your expert that said, we want to keep as much of that xanthine scaffold as possible. You'd only want to make small changes to a molecule, small conservative changes, not big ones. And here, you're looking to pull out the entire scaffold and replace it with a new one. And the record is quite clear that in this particular art, even small changes to a molecular structure can have dramatic effects on the properties of the molecule. And so, it's like a seesaw. The more substantial you do a modification, the less predictable what the result is going to be. And therefore, the more evidentiary support you're going to need to conclude that a POSA, even your preferred POSA, person of skill in the art, would have some reasonable expectation of success that you can do this full swap out of these two scaffolds. And I think ultimately, that's the concern. And that was the finding against you here by the district court after going through a full trial. And I'm just wondering, how is it that that was an unreasonable fact finding here, given that your references that you're relying on, don't talk about inhibiting this particular enzyme or scaffold swaps? So, if you could just speak to that. Sure. First of all, Your Honor, the similarity between the two scaffolds, that's what he's talking about. And that is why you would use... If I can finish my answer, I see my time. The two scaffolds are very similar. If you look at the left-hand side of that uracil and the left-hand side of the xanthine, they're identical. They're the same on that left-hand side. So, the rest... So, the scaffolds actually are very, very similar to each other. And that's the point that our expert was making, is that that's why you choose uracil because it's very close to xanthine. And in fact, the evidence does show that there are DPP-4 inhibitors where the scaffold has been changed. And that's the vitamin reference that's at Appendix 3, 3, 4, 8, 9, and specifically in Figure 2. And there was testimony from our expert at Appendix 10-17 that said, take a look at those compounds. They all have different scaffolds. They all have the cyano and the amino groups in the same relative locations. And those differences are a lot... Differences between those scaffolds are much more different than xanthine to uracil. So, I think a person of ordinary skill, and if the court had looked at the evidence through that lens, would have understood that the change from xanthine to uracil is not a major change. It's, in fact, a conservative change because scaffolds are not what are responsible for the activity. Did Wiedemann show a xanthine to uracil swap? It did not show a xanthine to uracil swap, no, Your Honor. Yeah, that's right. But it showed this idea of scaffold hopping was prevalent in the DPP-4 context. That's right. I'm happy to keep answering questions, though, or to continue. I heard the timer. I think that means my time is up, and I'm happy to answer more questions. Are there more questions from the panel? No. Okay. All right. So, we'll give each of you two minutes for rebuttal, and we'll hear from Mr. Castanhas. Thank you, Your Honor. Thank you, Your Honor, and may it please the court. This court and the Supreme Court have said time and again that a trial is the main event, not a tryout on the road. In this case, Judge Chesler heard the party's evidence and their findings under Rule 52. She seems to have made some mistakes. I mean, you seem concerned about this argument about what's opposing here. In fact, your first argument in your brief is that there was invited error here, which seems to me an odd argument to make. The the position of the parties as to what's opposed have been consistent throughout, haven't they? Well, I think that it's true that the position of each party has been clear, but the defendants offered two different definitions of opposa. Their expert, Dr. Rotella, the expert who they patented, offered a higher standard than Dr. Ferraris did. In fact, Dr. Ferraris, who was the expert who presented their statutory obviousness defense under Section 103, not once did he suggest in his testimony that his understanding of a person of ordinary skill included specific experience with type 2 diabetes or DPP-4. In fact, he claimed to have been an expert. Let's just get to the heart of this. Suppose they're right about the level of skill in the art, and it has to be somebody who's had experience with DPP-4 inhibitors or with diabetes treatment. And let's just assume they're correct about that, and that Dr. Nichols doesn't qualify under that standard, and we have to take Dr. Nichols' testimony out of the picture for that reason. Is there still a basis for sustaining what the district court did here? Not only is there a basis for sustaining what the district court did, that is exactly what the district court did do here. The district court properly recognized that the burdens belong to the defendants to show invalidity, and those burdens require them to show invalidity on each of their grounds by clear and convincing evidence. And this judge, and I think the exchange, Judge Dyke, I think it was you who had the back and forth with my friend Mr. Staberwal earlier in the argument, or actually I think Judge Chen then followed up with regard to his citation to given. He did not, and particularly at that footnote at page appendix 32, he didn't rely on Dr. Nichols. He simply observed what Dr. Nichols had said in this context. What the defendants' experts were found lacking on was not just the substance of their testimony, which was found lacking, but also basic credibility. This judge made affirmative credibility findings against each of these experts. Some of those findings seem to be pretty questionable, such as the suggestion that one of the experts had spent his early work on a particular kind of inhibitor. I had trouble following why that wasn't credible. But let's assume, again, that the credibility findings with respect to the defendants' experts were mistaken. So we take Dr. Nichols out of the picture. We say the defendants are not incredible because of these things that they testified to. But is there still a problem here if we were to do that? There are ample problems with that, Judge Dyke. And the biggest problem, and this was identified by Judge Chesler with regard to both expert witnesses of the defendants and each of their theories, was that they engaged in hindsight analysis. They knew the conclusion that they had to get to, and they worked from that direction. With regard to Dr. Ferraris, his section 103 statutory obviousness... Well, I'm trying to put that aside and focus on exactly what the argument here is with respect to double patenting and obviousness. On obviousness, I mean, assuming that the judge is wrong about the lead compound, there's still this necessity to replace the Santex scaffolding with a Uracil scaffolding. And what's the evidence that they presented that someone skilled in the art would have done that? All I'm hearing is that there would be a desire to create new compounds that would avoid the prior art. It seems to be a critical feature of the obviousness analysis. And that's not enough. In fact, if you look, for example, at the testimony of Dr. Rotella, pages Appendix 911 to 912, he goes through and is asked about Wiedemann. He's asked about the W.O. 496 patent. He's asked about the C.A. 730 patent. And he says that Uracil is never mentioned or disclosed in any of those references. And in fact, he goes so far as to mention the Mark 2004 patent, which is the Kenstrip reference that my friend Mr. Staberwald referred to in his opening argument. And the testimony is as follows. And this is at 912 line 3. And the Mark 2004 patent discloses a large number of DPP-4 inhibitors yet, doesn't say one word about using Uracil as a scaffold, does it? Answer, no. So, where they're looking for motivations, they are recreating their case after the fact based on having to assume, as Judge Dyke, you've had to make a number of assumptions, just in their cases, just to get to this point, assume that the judge didn't do what he explicitly said that he did, which is to properly consider the person of ordinary skill level through the higher lens that we have heard a lot about in the opening arguments. And that's particularly, that's particularly evident when it comes to his discussion of the Judge Chesler's discussion of the obviousness type double patenting arguments at pages 39 to 42. He explicitly states that he is using Dr. Rotella's higher standard in that regard. So, again, with regard to the attack on Dr. Nichols, I'm not sure where that gets them, because they bore the burden. This was a case, a classic case of competing experts. Their experts were found wanting, their experts were found to have engaged in hindsight analysis. Their experts were, in fact, in both cases were found to have been given their starting reference, not by searching the prior art, but by the lawyers in the case. So, I end with where I started, which is that the trial is the main event. The judge made findings. They're not clearly erroneous. He applied the proper legal standards. And he said, both at page A30, and then again, at pages A39 to 42, that he was applying the higher standard that they're arguing. That's why we've said that even if there was an error, even if they could possibly show on this record that the lower standard of a person of ordinary skill was applied, they would have invited that error because, in fact, their Dr. Ferraris used exactly that standard in his testimony. So, unless the court has further questions for me, I think we can rest on the briefs of the argument already given. When it comes to the obviousness type double patenting challenge, I heard the opposing counsel talk about how this Kim reference is very important, very relevant in what it teaches about uracil. And then I believe he made a reference to a prior art reference in the record that establishes that it was known in the art that uracil inhibits this PPP4 enzyme. Do you have a response to that? Judge Chen, I think I must not have spoken clearly because that's the Kenstrip reference, which we refer to in our briefs as the Mark 2004 patent from the Beringer-Ingelheim Company. That's the one that does not at all mention uracil. And that's also relevant to the testimony that I just read to you from Dr. Rotella, who at page appendix 912, lines 3 to 6, said it doesn't say one word about using uracil as a scaffold, does it? And he agreed with that and said, no, it does not. Okay. And then I know there's been a lot of talk here about how to properly define the relevant person of skill in the art for purposes of this case. I think the other side is citing a federal circuit decision called Daiichi, 2007, and relying on that. And I was just wondering if you could speak to why you believe your proposed articulation of the skilled artisan is appropriate. It doesn't maybe have to be the very best, but at least it's appropriate for purposes of this case. So, Judge Chen, I think the answer is that, as the record reflected here, medicinal chemistry, people work in multiple areas and they take from these various areas. And that's why both Dr. Nichols and Dr. Ferraris did not have the specific to the particular technology that is actually claimed in the patent, DPP-4 and type 2 diabetes, as part of the definition. And I think that the testimony of Dr. Nichols on this point, and again, as agreed to by Dr. Ferraris, should make that clear. What we believe is going on here is that the higher standard that was proposed only by Dr. Rotella is being used to cover up a number of sins in their case by suggesting that a person of ordinary skill would be able to make all of these counterintuitive leaps that Judge Chesler, at length, described in his opinion with regard to both of their theories. Well, that sort of hurts you because that seems to suggest that if we were to agree with the appellant that their skill in the art was certainly not to suggest that for a second. I was simply trying to point out what the, to unpack what the strategy is that's being used by one of the two defendants in this case. Well, I mean, the Diace case lays forth the number of factors that you would consider, and neither one of you really seems to analyze the question based on the Diace factors. I mean, this is a pretty specialized area, and Dr. Nichols' experience didn't include working on diabetes or DPP-4 inhibitors. Well, I think I also need to bring the court back to one other citation in the record with regard to that. And one of the reasons why this isn't really established in the record is that the other side didn't make an objection to this. Mr. Soberwal talked about this being a bench trial and not wanting to irritate the trial judge, but quite frankly, you still have to make your objections. And if I could point you to page 1136 of the appendix, after Dr. Nichols was qualified as an expert, our lawyer said, Your Honor, we proffer Dr. Nichols as an expert in medicinal chemistry, pharmacology and drug development. Mr. Soberwal, no objection, Your Honor. The court so deemed. So again, with regard to the late coming objection to Dr. Nichols, his testimony was viewed as relevant and arguing that Rule 52 strikes me as a bit too late in the trial. I'm running out of time, unless the court has further questions. Okay. Hearing none, we'll hear from Mr. Soberwal for two minutes. Thank you, Your Honors. Your Honors asked the question several times, if we take Dr. Nichols out of the picture, is it essentially game over? And the answer is yes, for the simple reason that there were only two witnesses at this trial. There was Dr. Rotella and there was Dr. Nichols. There were no other witnesses. The judge gave us very little time to present our case. There were no opening statements and no closing arguments. Dr. Nichols does not have any scintilla of experience in this field. I don't know why Takeda chose this expert, but they did. Dr. Rotella, on the other hand, has extensive experience. Nevertheless, the judge said, even though I'm going to agree with you that the higher standard applies, he then relied on the testimony, who by his own definition, his own witness, his own statement said, I don't meet this definition. So that's number one. Let me go back to a question that was asked about the Canstrup references and the Marsh references. And by the way, my colleague, Mr. Cansinides, had misspoke on those. So I'm going to start with APPX 1473 to 1474 that discusses both the Canstrup reference and the Marsh reference. And in both of those, Your Honor, in both of those, there is a two-member ring, one of which is a uracil ring. And based upon that, the authors discussed the use of this as a DPP4 inhibitor. This was in the prior ARP. We also did demonstratives. Those are at pages 43090 to 43091. With respect to testimony, that is at APPX 898 to 899. So we sufficiently and extensively discussed these references. Your Honor, I'm going to do something unusual today. And I'm doing this only because I would have never thought that my counsel on the other side would have accused us of waiving our right to file a Daubert motion. We have, I have an email. Your Honor, can I finish? Just one last sentence. Yeah, but you can't refer to something that's outside the record. Okay. Just so the record is clear, I would have never expected that the other side would accuse us of waiving this when we had already agreed, which is why we didn't include it in the record. But may I have one more minute? I think we're out of time unless there are questions from my colleagues. No. Okay. Thank you. We'll hear from Mr. Poulos for two minutes. Thank you, Your Honors. The first point I wanted to make is on the motivation. The law in this court has made clear that it's sufficient to show that the claimed and prior ARP compounds possess a sufficiently close relationship to create an expectation in light of totality of prior ARP that the new compound will have similar properties to the old. And that's the Otsuka case. So the point there being, Your Honors, is that the motivation can come from anywhere and does not need to be the absolute best, that there was only one way forward. Rather, it's the fact that you have a lead compound and the whole purpose of a lead Behringer, Ingelheim, and Novo Nordisk came up with decax. And it was called a lead. There's evidence in the record that that was their lead. And that's our expert's testimony at Appendix 1000 to 1001, that this was their lead. They were going to make modifications to it. And that's how this ARP proceeds. And the prior ARP actually says something about that too. And this is Bohm reference at Appendix 33375, that the aim of scaffold hopping is to discover structurally novel compounds, starting from known active compounds by modifying the central core of the structure of the molecule. And that this is a central task of modern medicinal chemistry. And in the introduction to that reference, it basically says what the Otsuka case, what this if you can improve the properties. And that's all that's needed to be shown for the lead and for the motivation. It doesn't have to be that it was the single best solution that is predictable. It just has to have a reasonable expectation of success. And that's what's shown here, given the similarity in the scaffolds. Thank you, Your Honor. Okay. Thank all counsel. The case is submitted. That concludes our session for this morning. The Honorable Court is adjourned from day to day.